**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**AT BRIDGEPORT**



2001 APR 26  ₽  1: 26

In re

Case No. 21-bk-50250 (JAM)

KAI-UWE M. YOUNG,  Debtor

**ADVERSARY PROCEEDING**

KAI-UWE M. YOUNG, an individual, and
ANNA DEFRANCO, an individual,

**ADV. NO.:** _____

                          Plaintiffs,

-vs-

**COMPLAINT FOR DAMAGES
FLOWING FROM DEFAMATION,
UNTETHERED ATTORNEY
LITIGATION ABUSE, DECEIT,
LIBEL, QUIET TITLE, AND
INJUNCTIVE RELIEF.**

ERIC D. HOUSER, A LAW CORPORATION,
a Corporation of the State of California,
ERIC D. HOUSER, a natural person, and
SYLVIA HOUSER, a natural person, and all
persons claiming by, through, or under such
person, all persons unknown, claiming any legal
or equitable right, title, estate, lien, or interest in
the properties described in the complaint
adverse to Plaintiffs titles thereto; and DOES 1-
50, Inclusive;

COMES NOW debtor and plaintiff herein, KAI-UWE M. YOUNG, and co-plaintiff

ANNA DEFRANCO ("Plaintiffs"), similarly situated, and respectfully allege the following:

1

## INTRODUCTION

This is a case involving plaintiffs similarly situated, now or previously before this Court, who have suffered harms, losses and injuries inflicted by an attorney claiming to be a member of a law professional corporation of which he is not, with the purported rank of "partner," claiming accreditation before the Connecticut State Courts with a Juris Number that is issued to a non-existent law corporation. The attorney further does not represent the claimant that was placed upon the Summons and Complaint, and did not have and never has had any privity with the named claimant, and was never retained by the claimant recited in the various Court papers. The Claimant asserted rights as against the plaintiffs and their respective properties, which Claimant did not have and never did have. The Claimant was never an aggrieved party as claimant had and has no harms, losses or injuries by any act or failure to act of or by either of the co-plaintiffs.

Nonetheless, the attorney and his colleagues have undertaken a multi-year, aggressive campaign of harassment and abuse as against the plaintiffs herein, hapless consumers caught up in the actions of disturbed individuals seeking to wrest away the legitimate properties of the plaintiffs. The Courts have thus been confronted by rogue attorneys untethered to any client who have scoured the landscape seeking to act as bounty hunters to go collect on allegations of indebtedness held by yet other parties, all without even a scintilla of authority. Finally, the attorneys have done so with scienter, in the afore knowledge that they did not represent the entity put forth to the Courts as a claimant, yet cynically misrepresented themselves before the Courts as being the attorneys retained, to press what turn out to be non-existent claims.

The conduct of the defendants have had and continue to have enormous deleterious impacts upon the plaintiffs. Both plaintiffs have had the titles to their properties slandered by filings placed thereon by the rogue attorneys. Both plaintiffs have suffered marital stress and

2

disintegration from the acts and practices of the attorneys. Plaintiff Kai-Uwe Young has seen his wife, the mother of his children, succumb to depression and alcohol. Plaintiff Anna DeFranco has endured the disintegration of her marriage. As an immigrant from Poland, who can fairly be described as an unusually attractive woman, plaintiff DeFranco was Ordered by subpoena to undertake a "deposition" in a hotel bedroom, where there was no stenographer present; indeed, the rogue attorney never intended for any deposition, and abused the authority vested in him as an Officer of the Court to attempt sexual predation by coercion as against Ms. DeFranco.

Both plaintiffs ended up exhausted of their funds, and consequent to the unremitting warfare perpetrated upon them by the attorneys hired by or partner of the actual law firm now defendant herein, and were forced to seek relief before the United States Bankruptcy Court for the District of Connecticut, DeFranco under docket no. 16-21739, and plaintiff Young in the instant docket, 21-50250. Defendants have ruined the credit and reputation of plaintiffs by their predatory acts, for which plaintiffs now seek relief.

Plaintiffs thus bring this Adversary Proceeding to seek relief by way of injunction and damages as against defendants.

## COMPLAINT

1.     This adversary proceeding is brought pursuant to 11 U.S.C. §506 and Federal Rule of Bankruptcy Procedure 7001.

2.     This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§151, 157 and 1334(b). Venue is proper pursuant to 28 U.S.C. §1409.

3.     This adversary proceeding is a core proceeding as defined at 28 U.S.C. §157(b) (2) (b) and (b) (2) (K) in that it is an action to determine the nature, extent and validity of a lien on property apparently evidenced by a mortgage, and the allowance or disallowance of a claim.

3

This is a core proceeding pursuant to 28 U.S.C. § 157(b), and jurisdiction exists pursuant to 11 U.S.C. § 502 (a) and (b) (1), 11 U.S.C. § 544 (a) (3) and (b) (1), 28 U.S.C. 1334, 28 U.S.C. 2201 for declaratory relief and 28 U.S.C. 1367 for pendent state law claims.

## PARTIES

4.  Plaintiff KAI-UWE M. YOUNG [hereinafter: "Young"] is an individual, at all material times a resident of the State of Connecticut. Plaintiff Young is a debtor of the within-captioned bankruptcy case, having filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code on April 12, 2021 [hereinafter: "the Young Bankruptcy Case"] in the District of Connecticut, Case Number: 21-bk-50250.

5.  Plaintiff is and at all times mentioned herein is the owner and purchaser of real property known as 81 Pine Hill Avenue, Stamford, Connecticut 06906.

6.  Plaintiff ANNA DEFRANCO [hereinafter: "DeFranco"] is an individual, at all material times a resident of the State of Connecticut. Plaintiff DeFranco was a debtor petitioning before the Connecticut Bankruptcy Courts, having filed a voluntary petition for relief from abuse under Chapter 13 of the Bankruptcy Code on October 25, 2016 [hereinafter: "the DeFranco Bankruptcy Case"] in the District of Connecticut, Case Number: 16- 21739.

7.  Plaintiff DeFranco is and at all times mentioned herein is the owner and purchaser of real property known as 225 Ox Yoke Drive, Berlin, Connecticut [hereinafter: the "Subject Property"].

8.  Defendant ERIC D. HOUSER [hereinafter: "defendant Houser"] is, upon information and belief, a natural person residing at 3 Seabreeze Terrace, Dana Point, California 92629. Defendant Houser holds himself forth as a highly skilled and polished attorney licensed to practice in the State of California.

4

9.     Defendant SYLVIA HOUSER [hereinafter: "defendant Sylvia"] is, upon

information and belief, a natural person residing at 3 Seabreeze Terrace, Dana Point, California

92629. Defendant Sylvia held herself forth as the "secretary" of at least one of defendant

Houser's law "corporations," in a Filing with the California Secretary of State dated July 15,

2009, bearing docket number E-786560, and is a willing participant in the schemes of fraud,

deceit and avarice as further described herein. Defendant Sylvia Houser is herein included,

together with defendant Eric Houser, as the "Houser Defendants."

10.     Defendant ERIC D. HOUSER, A LAW CORPORATION [hereinafter, "EDH

Corp."] is, upon information and belief, a Corporation operating in the State of California under

registration number C-238083. The Corporation is a vehicle for the Houser Defendants to

perpetrate their abuses and deceits upon the consumer public generally and the plaintiffs herein

specifically, and is liable in tort to plaintiffs jointly and severally with its artifice creators, the

Houser defendants. The agent for service of process of EDH Corp. is Eric Donald Houser, with

an address for service of process at 9970 Research Drive, Irvine, California 92618.

## NON-PARTIES OF NOTE HEREIN

11.     The non-party FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver

for NetBank is, upon information and belief, a Corporation of the United States of America,

located 3501 Fairfax Drive, Arlington, VA 22226 [hereinafter: "FDIC"]. Agent for Service of

Process is Jay Lerner, Inspector General, at that address. FDIC is the entity that has seized the

entity NETBANK, a banking institution that became insolvent on September 28, 2007 and is

named as "lender" on various loan documents in the DeFranco cause.

12.     The non-party MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

[hereinafter: "Mortgage Electronic"] is, upon information and belief, a front corporation

5

established by a consortium of banks for the express purpose of creating a privatized scheme of alternate land records, thus effectively nullifying the 400-year-old system of Land Records Recordation at public offices. "Mortgage Electronic" is a Delaware sham corporation with address at 1818 Library Street, Suite 300, Reston, VA 20190, with Sharon Horstkamp as the Agent for Service at that address.

13.     The non-party FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver for IndyMac Bank is, upon information and belief, a Corporation of the United States of America, located 3501 Fairfax Drive, Arlington, VA 22226 [hereinafter: "FDIC"]. Agent for Service of Process is Jay Lerner, Inspector General, at that address. FDIC is the entity that has seized the entity INDYMAC BANK, a banking institution that became insolvent on July 11, 2008.

14.     The non-party DEUTSCHE BANK NATIONAL TRUST COMPANY [hereinafter: "DBNT" or "DBNTC"] is, upon information and belief, a subsidiary entity of Deutsche Bank Holdings, Inc., in turn a subsidiary of Deutsche Bank A.G., of Frankfurt, Germany, and is chartered under the laws of the State of California. Its principal place of business is located at 300 South Grand Avenue, 41st Floor, Los Angeles, CA 90071. DBNT is an operating subsidiary of Deutsche Bank Holdings, Inc., a Corporation located in New York with principal place of business in New York City, New York. Defendant DBNT represents itself and holds itself forth as a "claimant" as against the Plaintiff DeFranco, and has asserted a purported secured interest on Plaintiff's residence located at 225 Ox Yoke Drive, Berlin, Connecticut, by virtue of a lis pendens filed on the Land Records of the Town of Berlin. Defendant DBNT further has asserted a purported secured interest on Plaintiff Young's residence

6

located at 81 Pine Hill Ave., Stamford CT 06906, also by virtue of a lis pendens filed on the Land Records of the Town of Stamford.

15.     The Defendants herein named as "all persons claiming by, through, or under such person, all persons unknown, claiming any legal or equitable right, title, estate, lien, or interest in the property described in the complaint adverse to Plaintiff's title thereto" [hereinafter referred to as "the unknown defendants"] are unknown to Plaintiffs. These unknown Defendants, and each of them, claim some right, title, estate, lien, or interest in the hereinafter-described property adverse to Plaintiffs' title; and their claims, and each of them, constitute a cloud on Plaintiff's title to that property.

16.     Plaintiffs are ignorant of the true names and capacities of "Defendants" sued herein as "DOES" 1 through 50, and therefore sues these "Defendants" by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. Plaintiffs are informed and believe and thereon allege that each of these fictitiously named defendants claim some right, title, estate, lien, or interest in the hereinafter-described property adverse to Plaintiffs' title and their claims, and each of them, constitute a cloud on Plaintiffs' title to that property.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

17.     During 2006, the plaintiff Young sought to acquire a certain residential property [hereinafter: "the Young Property"] in the city of Stamford of the State of Connecticut, and in connection therewith was ultimately introduced to the non-party IndyMac Bank, Federal Savings Bank. Plaintiff Young received a proposal couched in the provision of an adjustable-rate loan product which had a negative-amortization feature, thus allowing the represented principal to actually increase during the timeline of the proposal.

7


18. Concurrent with the proposal described in part in paragraph 17 hereinabove, a paper titled "Adjustable Rate Note," together with a second paper titled "Addendum to Adjustable Rate Note," were presented to plaintiff Young, and he was instructed to sign the papers, which was completed on or about October 25, 2006, after which the two papers and others all bearing his signature were taken away by others and not to be seen again.

19. It has now been discovered that the proposal described in §§ 17 and 18 hereinabove with the papers described variously as "Note" were not factually Notes, as they did not memorialize the actual transaction, and were not representative of the actual transaction. Instead, the actual transaction was between other parties, undisclosed to plaintiff Young, as is evidenced by the [redacted] "MIN Number" placed on the various papers, including the Mortgage pledge of security thereto. The MIN Number references a registration of a loan transaction on the Mortgage Information data-base, kept in part by the non-party Mortgage Electronic Registration System, which can only assign a MIN Number to a completed transaction presented for registration, not to a merely contemplated transaction.

20. Inasmuch as the MIN Number was already on the papers presented to plaintiff Young before he signed any of them, there was already in existence yet another, undisclosed, transaction between other, undisclosed, parties that the MIN Number really represented.

21. The creation of a negative-amortization instrument renders the instrument non-negotiable by acceptance, as described in the Uniform Commercial Code under Section 3, and instead renders the instrument a security paper transferable only by sale, payment and delivery, under Section 9 of said Code.

22. The non-disclosures of the true lenders and true parties involved in the undisclosed transaction or transactions are and continue to be violations of the Truth in Lending Act (TILA), 15 U.S.C. ch. 41 § 1601, 82 Stat. 146, and Regulation Z (12 CFR Part 226) [collectively: "the TILA Act"]. The TILA Act and regulation give consumers the right to cancel certain credit transactions that involve a lien on a consumer's principal dwelling.

23. On or about July 11, 2008, the entity IndyMac Bank collapsed and filed for Chapter 7 bankruptcy, and was seized by the Federal Deposit Insurance Corporation ["FDIC"]. Prior thereto, plaintiff Young began to get a glimpse of the underhandedness and trickery engaged in by IndyMac and its various representing brokers, and a dispute arose between the parties as to whom, if any, was entitled to receive payments from plaintiff Young. That dispute remains unresolved.

24. On or about July 29, 2008, some two weeks after the IndyMac Ch. 7 bankruptcy filing related in § 23 above, an unknown person or entity filed the first slander of title to the Young Property on the Stamford Land Records, claiming an "assignment of mortgage" from MERS to "Wells Fargo Bank, N.A.," a non-existent entity.

25. The purported "assignment" of § 24 above is utterly fraudulent, a falsity, apparently fabricated by personnel in the back-office of Wells Fargo Bank, National Association ["Wells Fargo"]. Indicia of the fraud are that the purported "assignment" was signed by an "Amy Weis, VP," asserting that said Amy Weis was a vice president of "MERS," which was a fabrication. Weis was an employee of Wells Fargo.

26. Additionally, as IndyMac Bank, FSB was already before the Bankruptcy Courts with a Chapter 7 petition proceeding, it had no ability to "assign" an asset of the bankruptcy estate.

27. Nor did a "nominee" of IndyMac Bank, FSB have the ability to act as an agent of the principal where the principal was before the bankruptcy court in a Chapter 7 proceeding.

28. Even disregarding the substantive timeline of §§ 25-27 above, in any event the seizure of IndyMac by the FDIC precludes any ability of a nominee or agent of the precedent IndyMac from independently acting to file papers anywhere, much less to attempt to transfer or dissipate assets. Nonetheless, actors involved in the dispute and acting with the intent to harm the interests of plaintiff Young did so, with breathtaking arrogance.

29. Subsequent thereto, a series of other, equally fraudulent, purported "assignments" were placed upon the Stamford Land Records, in turn by Hunt Leibert Jacobson, PC [then a

9

foreclosure mill law firm in Hartford, Connecticut, and well known to our Courts], purporting to be "OneWest Bank;" then by "Wells Fargo Bank, N.A.," again a non-existent entity also and again fabricated by Hunt Leibert Jacobsen P.C.; then by Ocwen Financial Corporation, misrepresenting itself as "Ocwen Loan Servicing," claiming "assignment" from Deutsche Bank as trustee for a claimed "Harborview 2006-14" [a purported entity not otherwise described] to itself, Deutsche Bank, as trustee for "Harborview Mortgage Loan Trust 2006-14, Mortgage Loan pass-through Certificates, Series 2006-14," [a purported entity also not otherwise described]. The purported "Ocwen Loan Servicing" address traces back to an industrial concrete-block windowless warehouse building with truck docks, of 14,233 sq. ft., internally a self-storage unit building operated by "Security Connections, Inc." and crafted, as are all other "Ocwen" locations, as blind alleys intended to obfuscate and confuse, leading to dead-ends.

30.     The true picture of 240 Technology Drive, Idaho Falls, showing an industrial warehouse, is incorporated herein:



31.     The artifice of claiming to be located inside some industrial warehouse, wherein "Ocwen" pays hush-monies to "Security Connections, Inc." specifically to prevent the public and process-servers from actually finding Ocwen or the Ocwen-labelled entity "Ocwen Loan Servicing, LLC" is done with scienter, a culpable state of mind intended to further and perpetrate frauds, including financial frauds and frauds against properties owned by others.

32.     The Courts are thus confronted with a vast criminal enterprise, orchestrated and controlled by the fugitive William Erbey, operating by remote-control out of Valletta, Malta. The specific purpose of the criminal enterprise is to steal houses from American consumers.

33.     Defendants herein, and each of them, at all material times knew that they were, in advancing the interests of the "Ocwen" octopi of opaque entities, operating on behalf of schemes of fraud, and nonetheless undertook such representation, knowing that everything defendants did, and everything they pled to the Courts, were falsities; nonetheless, defendants proceeded to advance the schemes of William Erbey and his "Ocwen" front enterprises, in an effort to enrich themselves and the "Ocwen" criminal conspirators.

34.     The claimed entities of § 29 above do not trace back to anything, and are described by the Securities and Exchange Commission as "NEIT's," or "Non-Existent or Inactive Trusts."

35.     The falsified and fraudulent papers crafted as purported "Assignments" and filed on the Stamford Land Records are and were designed by the actors for the purpose of obfuscation and slander of title, and contain inherent false statements such as the claim that Deutsche Bank maintains offices at "1661 Worthington Road, Suite 100, West Palm Beach, Florida," when in fact it does not, and never has.

36.     The "Ocwen" panoply of corporate entities are the creations of the fertile criminal mind of one "William Erbey," a scandalous figure from Wall Street who has been banned for life from the securities industry by the Securities and Exchange Commission ["SEC"].

37.     William Erbey subsequently re-incorporated Ocwen Mortgage Servicing, Inc., his latest vehicle for mortgage fraud and abuse, in the British Virgin Islands, claiming a registration

address of Waterfront Center, Suite A, 72 Kronprindsens Gade, PO Box 305304, St. Thomas VGB. That address comes back to the "Trident Trust Company," a Virgin Islands "brass plate" corporation accommodation address provider, wherein a brass plate screwed onto the door is sufficient to establish corporate existence. The actual address used by Ocwen in its representations to the public and the courts sources back to a tourist souvenir knick-knack stall located at the foot of the cruise ship dock in the British Virgin Islands. The souvenir stall is currently boarded up.

38.    William Erbey, currently a fugitive from justice, since approached the authorities in Valletta, Malta, and purchased "citizenship" in Malta for the sum of 680,000 Euros. Malta thereupon issued the fugitive Erbey with a Maltese passport, good for unchallenged access to the Schengen-area countries, encompassing most of Europe.

39.    Notwithstanding the dismal record as described in part hereinabove, the Defendants and each of them shamelessly proffered the adulterated assignments as recorded on the Stamford Land Records as respects Plaintiff Young, and upon the Berlin Land Records as respects Plaintiff DeFranco, as documentary evidence in support of their unremitting avalanche of litigation abuse of Plaintiffs Young and DeFranco.

40.    During 2005, Plaintiff DeFranco was desirous of obtaining financing for the Subject Property and consequent thereto had contact with a certain Broker who took Plaintiff's credit Application and forwarded it to NETBANK. NETBANK in turn solicited bids for the proposed loan and sold the credit application forward, while placing itself on the now-sold loan application as the named "lender." In reality, NETBANK was not the true lender and was a mere accommodation nominee.

41.    The true lender has never been disclosed to the Plaintiff.

42.    Concurrent with the loan application package that NETBANK had sold, a certain paper styled as "mortgage" was crafted and presented to Plaintiff for signature. The paper suggested that the Mortgagee would be defendant Mortgage Electronic as nominee for NETBANK. In reality, Mortgage Electronic was not and never was a nominee for the true

12

lender, which was not NetBank. The pre-sold loan application package was placed into the Mortgage Electronic data-base system, a private recordation data-bank, under MIN Number "MIN 100014440002539443." The paper styled as "mortgage" was then recorded in the Land Records of the Town of Berlin at Vol. 554, Page 0299-0313 therein.

43.     A paper styled as an "Assignment of Mortgage" [hereinafter: the "588 Assignment"] was recorded in the Land Records of the Town of Berlin under Vol. 588, Page 0272, on June 7, 2007, suggesting that "Mortgage Electronic" assigned the apparent mortgage to the entity "*Deutsche Bank National Trust Company as Trustee under the pooling and servicing agreement Series ITF RAST 2005-A15, a California Corporation* (sic)."

44.     The "588 Assignment" represents that Mortgage Electronic had a place of business at 3300 SW 34th Avenue, Suite 101, Ocala, Florida. In reality, Mortgage Electronic did not have any business address at that location, and the representation was a falsity.

45.     The signature undertaking on the "588 Assignment" represents that it was signed by one "Paige Helen" as Vice President of "Mortgage Electronic as Nominee for NetBank." Despite this representation, the notarial undertaking declares that Paige Helen was in reality an employee of "IndyMac Bank, FSB."

46.     A paper styled as an "Assignment of Mortgage" [hereinafter: the "620 Assignment"] was recorded in the Land Records of the Town of Berlin under Vol. 620, Page 0812, on July 20, 2009, suggesting that "Deutsche Bank National Trust Company as Trustee under the pooling and servicing agreement Series ITF RAST 2005-A15" assigned the apparent mortgage to the entity "*Deutsche Bank National Trust Company as Trustee of the Residential Asset Securitization Trust 2005-A15, Mortgage Pass-Through Certificates, Series 2005-O under the Pooling and Servicing Agreement dated December 1, 2005.*"

47.     The "620 Assignment" is represented as signed by one "JC San Pedro," pursuant to the name stamp affixed thereto, claiming to be the "Authorized Signatory." The paper is bereft of any indication as to how "JC San Pedro" is an "authorized signatory," who authorized him, and under what circumstances.

13

48.     The notarial undertaking for "JC San Pedro" was taken in Williamson County, Texas. DBNT has no offices or place of business within Williamson County, Texas.

49.     The notarial undertaking for the "620 Assignment" is facially defective as it does not recite within the undertaking who "JC San Pedro" is an "Authorized Signatory" of; the place for the entity name is left blank.

50.     There is no Appendix or other Attachment to the "620 Assignment" Recordation that sets forth the authority of "JC San Pedro" to sign the paper, if indeed it was JC San Pedro that signed it, which itself is dubious, and cannot be determined from the paper as filed.

51.     The "620 Assignment" is absent a Notarial Seal, leaving the paper unexecuted.

52.     John O'Brien, Register of Deeds for the Southern Essex District Registry of Deeds, Commonwealth of Massachusetts, has declared by Affidavit dated 20 October 2016 that the person described as "Erica A. Johnson" is a "robo or surrogate signer." Register of Deeds O'Brien forwards all documents presented for Recordation containing the signature of Erica A. Johnson to the Massachusetts Attorney General's Office "for review and possible violation of a Crime against Property, specifically MGL Chapter 266, Section 35 A (b)(4)." The "588 Assignment" contains the signature of Erica A. Johnson.

53.     "Mortgage Electronic," a/k/a "MERS," holds itself forth to the public at large, and uses as its address in various purported "Assignments" filed in a plethora of instances around the country, as "1901 East Vorhees Street, Suite C, Danville, Illinois 61834." The address traces back to an industrial warehouse operated for pharmacy inventory distribution:



54.   "Suite C" turns out to be a side truck-dock door with an adjacent solid-metal pedestrian door, which is kept locked. Suite C, a separate truck-dock, is a narrow sliver of the windowless warehouse of about 1,000 sq., ft. It is rented to an individual, one "Daniel Schroeder," who murkily represents himself as "Metro Detective Agency." It would appear that the schemers behind "MERS" or "Mortgage Electronic" have created a blind alley of opacity, impenetrable to any other than the most determined sleuth. Break in to "Suite C," and you find a man with a gun.

55.   On September 14, 2015, Plaintiff DeFranco issued a Notice of Rescission rescinding the apparent loan transaction as reflected in a paper styled as note and another as Mortgage recorded as recited in paragraph 13 hereinabove. The Rescission is effective upon mailing by operation of law.

56.   The Notice of Rescission was recited by Recordation upon the Land Records of the Town of Berlin of a Notice of Interest in Lands, at Vol. 724, pages 655-656 therein.

57.   More than one year has passed since the Notice of Rescission was issued by the Plaintiff herein; wherefore, no debt is maintained by operation of law as against this plaintiff.

58.   DBNT commenced certain litigation against Plaintiff DeFranco in the Connecticut Superior Court by Complaint dated March 22, 2007, under docket no. HHB-cv07-600732-S. Therein, DBNT accelerated what it claimed was the debt. The cause was Dismissed by the Court [Abrams, J.] on 13 December 2012 [Dkt. No. 174.00] for failure to prosecute with due diligence.

59.   More than six (6) years have passed since the acceleration of the debt and no claimant has instituted timely litigation as against this Plaintiff herein, wherefore, the purported Note is unenforceable and no debt can be claimed as against this Plaintiff by operation of law.

60.   On or about September 2, 2011, Federal Housing Finance Agency (FHFA), by the United States Department of Justice, in its capacity as Conservator for Fannie Mae and Freddie Mac, commenced an action against the Deutsche Bank A.G., its various conglomerate subsidiaries (collectively, the "Deutsche Bank Defendants") in the United States District Court

15

for the Southern District of New York, captioned Federal Housing Finance Agency v. Deutsche Bank AG, et al., No. 11 Civ. 6192. Therein, the FHFA alleged that Deutsche Bank had engaged in criminal and wrongful lending practices as respects certain residential mortgage-backed securities. Contained therein by reference was the *RAST 2005-A15* trust, recited in paragraph 46 hereinabove.

61. A Settlement Agreement was entered into between the United States Department of Justice and Deutsche Bank defendants on January 17, 2017. The terms of the Settlement Agreement required the Deutsche Bank Defendants to pay compensation and restitution to its victims in the collective amount of $4.1 Billion and a civil penalty to the United States of $3.1 Billion. This is in addition to the payment of $1.875 Billion previously paid for its mortgage frauds.

62. To date, DBNT has not paid any restitution funds to Plaintiff for its wrongful and fraudulent conduct.

63. The non-party Hunt, Leibert, Jacobsen P.C. commenced litigation against plaintiff DeFranco by Summons and Complaint with return date of June 18, 2013. Thereafter Zachary Grendi [hereinafter: "Grendi"], an associate hired by defendant Eric Houser, entered his Appearance and subsequently commanded plaintiff DeFranco to attend a "deposition" in a hotel bedroom at the Fairfield Inn, in Plainville, Connecticut, on October 06, 2014.

64. No stenographer was Ordered by Grendi to record any "deposition." In truth, Grendi's sole motivation was to place plaintiff Anna DeFranco under duress, and to coerce sexual favors from plaintiff Anna DeFranco.

65. At the time that Grendi undertook his despicable acts, he was an agent or servant of the defendants herein. Grendi was ultimately supervised and under the control of defendant Eric Houser.

66. Grendi was replaced by another series of individuals hired by and servants to the defendants herein. Ultimately, "Jordan Schur" [hereinafter, "Schur"] entered his Appearance as

16

an individual attorney and not as a servant of the defendants, and therein with his Appearance claimed that he represented "Deutsche Bank National Trust Co." ["DBNTC," or "Deutsche"].

67.    In truth, Schur did not represent DBNTC.

68.    In truth, nobody at Deutsche Bank had ever heard of Jordan Schur, nor for that matter did Deutsche Bank have any retainer agreement with either "Houser & Allison, APC" or defendant "Eric D. Houser, A Law Corporation."

69.    Nonetheless, Jordan Schur proceeded to pepper the Court with an avalanche of Motions and Pleadings, all claiming that Schur represented DBNTC and that Schur's employers were "Houser & Allison."

70.    Schur then took the controversy to a court trial, and proffered as his "witness" a certain "Sony Prudent" [hereinafter: "Prudent"] who testified that he had his personal knowledge of anything and everything by looking at computer-screen inputs of a platform described to the Court as the "RealDoc Vault" system. Prudent apparently was introduced to the case about three weeks before he appeared at trial. Prudent had no first-hand knowledge of anything.

71.    In a subsequent matter, pursuant to Court Order from the Bench that Prudent prepare an Affidavit as to the claimed payments made by or incurred by "the Plaintiff," Prudent prepared his Supplemental Affidavit of various "costs" he claimed were incurred by "Ocwen." Notably, "Ocwen" is not the Plaintiff.

72.    The Supplemental Affidavit proffered by Prudent stated that he was "employed by Ocwen Financial Corporation, whose indirect subsidiary is Ocwen Loan Servicing, LLC." Nonetheless, the Supplemental Affidavit ends with the Declaration that it is submitted by "Ocwen Loan Servicing, LLC," and signed in that capacity by Sony Prudent.

73.    Prudent testified that he had an "address" of 1661 Worthington Road, Suite 100, in West Palm Beach, Florida. West Palm Beach is located in Palm Beach County. Nonetheless, the Supplemental Affidavit represents that it was Undertaken in Broward County.

74. In truth, Prudent actually works in Jacksonville, Florida, some 326 miles to the North.

75. In truth, the Supplemental Affidavit was manufactured by Jordan Schur and shipped off to Ocwen Loan Servicing for execution. It was not signed at Prudent's home or at his place of work. The Notary, who is an internal employee of the Ocwen octopi of companies, executed the undertaking without Prudent present.

76. The entirety of the Supplemental Affidavit is a falsity, from the fertile mind of Jordan Schur, and crafted by Schur with the specific purpose of furthering the statutory theft of the DeFranco home by the Ocwen interests. The Court relied upon the representations of the Affidavit in reaching its decision.

77. The matter went to Appeal. At Pre-Argument Conference before Judge Cutsumpas of Waterbury in Waterbury, the Court [Cutsumpas, J.] interrogated Schur as to who his client was. Schur repeatedly and evasively responded "I represent the plaintiff." Whereupon, the Court declared: "Mr. Schur, that is not good enough. What is the name of the party you represent?" At that point, Schur blurted "Ocwen."

78. Although Schur did not enter his Appearance in the DeFranco case as an attorney with either *Eric D. Houser, A Law Corporation*, or "*Houser & Allison APC*," nonetheless it remains that Schur is employed by defendant Houser and apparently is a "Partner" in the defendant *Eric D. Houser, A Law Corporation* enterprise. The enterprise remains liable for the wrongful acts and torts of Schur under the principle of *respondeat superior*.

79. In the course of progress of the trial of the DeFranco controversy, Plaintiff DeFranco, the defendant therein, filed for protection from creditors before the United States Bankruptcy Court, District of Connecticut, under Docket No. 16-bk-21739.

79. Jordan Schur boasts on the website of "Houser & Allison," apparently a predecessor incarnation of the current enterprise defendant *Eric D. Houser, A Law Corporation,* that he has triumphed with "Judgments" as against the plaintiffs herein. In truth, there are no final judgments. As to plaintiff DeFranco, the jurisdiction of the trial court ceased at the moment

18

when plaintiff DeFranco applied for and was granted protection from creditors by the said Bankruptcy Court. Any further pronouncements from the state trial court, either by way of judgment or otherwise, are void *ab initio* by operation of law. As to plaintiff Young, no final Judgment has been exercised and the docket remains pending.

80. In the matters of plaintiffs Young and DeFranco before the state courts of Connecticut, Jordan Schur maintained that he represented the claimed entity DBNTC ["Deutsche]' allegedly in its capacity as a "trustee" of a certain trust. In truth, Jordan Schur did not represent DBNTC, neither in its alleged capacity as a "trustee," nor in any other capacity.

81. Indeed, Jordan Schur's client, and the entity with which *Eric D. Houser, a Law Corporation*, a defendant herein, was retained, was Ocwen Financial Corporation ["Ocwen"].

82. In truth, neither DBNTC as a national association bank, nor DBNTC as the purported "trustee" of either the so-called trust it claimed in the matter of Young, nor of the so-called trust it claimed in the matter of DeFranco, paid value to someone who owned the underlying obligations alleged in exchange for a document of conveyance transferring the ownership of the underlying obligations.

83. In truth, neither DBNTC as a national association bank, nor DBNTC as the purported "trustee" of either the so-called trust it claimed in the matter of Young, nor of the so-called trusts it claimed in the matter of DeFranco, carries a loan account receivable in the name of either DBNTC or of DBNTC as a purported trustee of anything, as asset entries on their general ledger.

84. Nonetheless, Jordan Schur aggressively pursued litigation as against his victims the plaintiffs herein, asserting substantively that DBNTC was a "lender" and "creditor" entitled to sums from Young and DeFranco, while in the knowledge that those assertions were not true. Further, Jordan Schur did so knowing that he was not retained by DBNTC, and had no authority from DBNTC to advance those spurious claims.

85. Jordan Schur also interposed himself into the Bankruptcy Petition of plaintiff DeFranco. For example but without limitation, by filing dated April 06, 2017, Schur filed a

19

Motion titled *Defendant's Motion to Dismiss Debtor's Complaint*, 17-02018, wherein Schur represented to this Court that Schur, now under the wings of *Houser & Allison, APC,* was counsel retained by Deutsche Bank National Trust Company of a certain "Trust," which was not truthful, and which both Jordan Schur and Eric Houser knew was untruthful. [The *Motion* was not addressed by the Court.]

86.    Neither Jordan Schur nor Eric Houser nor any of Houser's corporate alter-ego law firm entities had any authority to file Pleadings for DBNTC, as DBNTC did not retain either Schur, or Houser, or the Houser alter-ego law firms.

87.    Matters in the State Court litigation as respects plaintiff DeFranco herein resulted in an order by that court for the parties to continue mediation to resolve their differences. Whereupon, Jordan Schur crafted a settlement proposal couched as a "Loan Modification Agreement" [hereinafter: "the Proposal"] and presented same to counsel for DeFranco on a "take it or leave it" basis.

88.    The Proposal required that, as a pre-condition to any settlement, DeFranco would acknowledge in writing that she was indebted to the novel entity "PHH Mortgage Co." ["PHH"] as the "owner of the debt" for sums in excess of $350,000.

89.    In truth, PHH is the latest component in the massive octopi of OCWEN corporate vehicles of mortgage fraud and abuse, being a subsidiary of the parent or holding company Ocwen Financial Corporation.

90.    PHH never paid any sums certain for any debt of either plaintiff herein, and Jordan Schur's tactics of coercion, oppression, and placing the plaintiffs herein under duress were wrongful, and injurious, and are and constitute an abuse of litigation, and are and constitute an effort to conclude statutory theft of the plaintiff's Properties.

### III.  ISSUES PRESENTED & CLAIMS FOR RELIEF

91.    The Federal Truth in Lending Act, 15 U.S.C. § 1635, Regulation Z § 226.23 allow

20

for a borrower to rescind the Note and Deed of Trust by operation of law. This occurred in this case as of September 14, 2015 when Plaintiff sent the rescission notice and more than 20 days had elapsed without any formal response from any entity within the claims recorded on the Land Records of the Town of Berlin..

92.   Specifically, the undisputed evidence shows that Plaintiff properly rescinded both of her 2005 note and apparent mortgage under TILA 15 U.S.C. § 1635(a) on September 14, 2015, effectively voiding all contracts and debt. Therefore, Defendants had no standing to initiate a foreclosure or collect payments under the contracts because those contracts were extinguished by operation of law on September 14, 2015.

93.   This loan was the result of predatory lending; it was based on illegal and unfair business practices and fraud that were designed to force Plaintiff into forfeiting her property, valued at over $300,000 dollars. The law does not stand for such practices. DBNT, Mortgage Electronic, IndyMac Bank, and FDIC have no standing and have never had any valid title or legal right to Plaintiff's payments or a valid secured interest.

94.   The facts are clear and undisputed; Plaintiff 's loans were rescinded and extinguished by operation of law on September 14, 2015, and no party could obtain any rights or interest to enforce contracts that were made void after this date.

## PLAINTIFF IS ENTITLED TO DECLATORY RELIEF BASED ON HER LEGAL RESCISSION UNDER TILA

95.   TILA gives borrowers a "right to rescind" for some kinds of consumer credit transactions. 15 U.S.C. § 1635(a); see 15 U.S.C. § 1635(d) (right to rescind is unwaivable except in emergency circumstances). Rescission applies to transactions in which a creditor takes a security interest in an obligor's "principal dwelling" and in return, provides money on property the obligor uses for non-business purposes. 15 U.S.C. § 1635(a). In 1974 TILA was amended to limit the time an obligor had to rescind a transaction to three years after the *consummation* of the transaction or sale of the property. 15 U.S.C. § 1635(f).

21

96. Of primary concern, and importance, as clarified in the United States Supreme Court in *Jesinoski v. Countrywide Home Loans, Inc.*, 135 S. Ct. 790, 190 L. Ed. 2d 650, 574 U.S. (2015), the obligor's exercise of the rescission triggers a series of steps through which the transaction is unwound. See *Beach*, 523 U.S. at 412-413. First, when an obligor exercises his right to rescind, she is not liable for any finance charge or other charge, and any security interest given by the obligor becomes void upon rescission. 15 U.S.C. § 1635(b). Second, within twenty days after receipt of the notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, down payment or otherwise, and shall take any action necessary or appropriate to reflect termination of any security interest created under the transaction. *Ibid.* Third, upon performance by the creditor's obligations under this section, the obligor shall tender any property the creditor has previously delivered (or its reasonable value). *Ibid.* Pursuant to Reg Z notice is given by mail, telegram, or other means of written communication. 12 C.F.R.226.23(a)(2) ; See 12 C.F.R. Pt. 226, Apps. H-8, H-9 (Model forms for excising Rescission Right); 12 C.F.R. 1026.23(a)(2).

97. Erroneously, lower Courts have misinterpreted § 1635 as requiring the obligor to file a lawsuit to effect rescission. However, the plain language of the statute puts no such requirement on the obligor. That provision "says nothing in terms of an action" or a "suit's commencement"; rather it speaks to the "duration" of the rescission right. *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 417 (1998). The Supreme Court found that nowhere does § 1635(a) allow for a debate as to disputed or undisputed notices; simply put the transaction and its contracts are void as a matter of law upon mailing of the Notice of Rescission. Jesinoski, *supra*, at 793 . Based on the clarification of the TILA rescission by the Supreme Court, Plaintiff's contracts became void as of September 14, 2015. Regardless to whether the creditor fulfills its legal requirement to return all funds paid on the loan and reflect the termination of the security instrument, the loan no longer exists; the contracts are void and any acts by any party based on the loan or contracts are illegal.

22

**Burden of Proof and Elements**

98. All Plaintiff is required to show is the loan was rescinded by virtue of written notice. Period. She has done so – as found by her Filing and Recordation of the Notice of Rescission and Interest in Lands upon the Berlin Land Records. Elements are by matter of law proven by No Response to Letter by any claimed party to the various Assignments as recorded on the Land Records.

99. The letter was mailed on September 14, 2015; the creditor had 20 days to file action in dispute of the notice of rescission and chose not to do so. The loan and contracts are void and must be cancelled as a matter of law effective September 14, 2015.

100. The Notice of Rescission and Interest in Lands was filed on the Land Records of the Town of Berlin, thereby "memorializing" the September 14, 2015, by Filing at Vol. 724, pages 655-656 therein. The universe of possible claimants had another opportunity to file an action/response in dispute of the notice of rescission and chose not to do so. The loan and contracts were void as of September 14, 2015 and must be cancelled as a matter of law.

101. Notwithstanding the (a) stale-dated purported note by virtue of acceleration and then abandonment by DBNT; (b) the failed and unperfected purported assignments of mortgage as alleged hereinabove; (c) the lapse of one year after Notice of Rescission now vacating and voiding all claims of debt in whatsoever form, *nonetheless* Jordan Schur has continued to harass the Plaintiff by filing and continuing litigation within the Connecticut Superior Court; has utterly failed and refused to refund to Plaintiff the sums paid under the apparent loan, together with all deposits and earnest monies and all fees; and has refused and failed to remove, by the filing of a vacating of same, the Lis Pendens that Hunt, Leibert, Jacobson P.C., DBNT, and Ocwen has placed upon the Land Records of the Town of Berlin as to the Subject Property, thereby slandering the title thereto and inflicting harms, wrongs and injuries upon Plaintiff DeFranco herein.

23

<div align="center">

**COUNTS**

</div>

**FIRST COUNT**      **Plaintiffs Count for Statutory Theft
                        [as to all defendants]**

1.      Plaintiffs re-allege each of the previous allegations as if set forth fully herein.

2.      The acts and practices of the defendants and of Jordan Schur were designed with the specific and deliberate intent of wresting away the Properties of the Plaintiffs, wherein attorney Jordan Schur made false assertions in court with the intent of depriving them of their property in an effort to hand the property to the non-party Ocwen Financial Corp., and ultimately to Ocwen's sub-set entity, PHH Mortgage Corp, the reincarnation of the disgraced Ocwen enterprises.

3.      C.G.S. § 52-564 action for civil theft provides for treble damages.

4.      Jordan Schur takes the attitude that a license to practice law in Connecticut is a license to steal; that an attorney may commit the crime of larceny of another's property with impunity, safely cloaked in the absolute immunity from suit afforded by the litigation privilege, as long as he is careful to perpetrate the theft within the context and confines of civil litigation. Jordan Schur's attempt to hide behind the litigation privilege to avoid the consequences of his despicable conduct, however, takes the litigation privilege a bridge too far, is contrary to the public policy underlying the litigation privilege, and is unsupported by the case law which has developed the privilege.

5 .      At all material times, defendants and each of them knew, ought to have known, or could reasonably have foreseen that there are three elements that must be satisfied to enable a claimant to advance a cause against Plaintiffs herein as respects their respective homes. Those elements are: (1) the existence of the debt, (2) ownership of the debt by the claimant, and (3)

<div align="center">24</div>

authority from the owner of the alleged underlying obligation. Those three elements have been ignored by defendants, who have wrongfully proceeded to represent to the Courts and the public at large that their facial client, Deutsche Bank, had rightful claims against Plaintiffs, including a rightful claim of security interest in the Plaintiffs' properties. Defendants advanced that cause although defendants, and each of them, and Jordan Schur, at all material times knew that those three elements did not exist, neither for Deutsche Bank nor for their true client Ocwen Financial Corporation. No such loan account receivable exists on the accounting ledgers of Deutsche Bank ["DBNT"], neither on its own account nor as "trustee" of some purported "trust."

6. Deutsche Bank, neither for its own account nor for that of any purported "trust" as so brazenly falsely represented by defendants herein and Jordan Schur, had any risk of loss on account of any purported "loan" claimed as against Plaintiffs herein, and no act or failure to act on the part of the homeowner plaintiffs herein would lead to any harm, loss, or injury to said Deutsche Bank; nonetheless, defendants and each of them including by agent or servant proceeded against Plaintiffs to convert the titles of and to properties of plaintiffs to their own name, thereby and thereupon committing civil theft thereof.

7. Real property can be the object of a civil theft, as C.G.S. § 53a–118(a)(1), which applies to C.G.S. § 53a-119, provides in relevant part, " 'Property' means any money, personal property, **real property**, thing in action, evidence of debt or contract, or article of value of any kind." (Emphasis added.) *Barretta v. Barretta*, No. CV09-5009664-S, 2011 WL 4031197, at *6 (Conn. Super. Ct. Aug. 18, 2011).

8. At all material times, the Defendants, their agents and servants, and each of them knew, ought to have known, or could reasonably have foreseen the fact that civil theft is, at its

25

core, a crime. Civil theft committed via litigation implicates the improper use of the judicial system.

9. By filing what are couched as "Certificates" upon the Land Records of the cities wherein Plaintiffs owned their homes, Jordan Schur, the defendants, and each of them knew full well that they had already wrongfully deprived Plaintiffs of ownership of their Property. Plaintiffs seek money damages, treble damages for civil theft, pursuant to C.G.S. § 52-564, common law punitive damages for civil theft in the amount of their attorney's fees, interest from the date of the civil theft, the costs of this action, and such other and further relief to which they may be entitled at law or in equity.

**SECOND COUNT** **Plaintiffs' Count for Slander of Title [as to all defendants]**

1. Plaintiffs re-allege each of the previous allegations of paragraphs 1 to 101, above, as if set forth fully herein.

2. Paragraph 9 of the First Count of the Complaint is hereby incorporated as paragraph 2 of this the Second Count of the Complaint.

3. The Filing of false papers styled as "Assignment of Mortgage" [variously, "Corporate Assignment of Mortgage"] manufactured by persons with no interest in the debt, seeking to represent to the world at large that the writers had such interest and were authorized to manufacture and place same upon the Land Records, are and constitute a Slander of Title of Plaintiffs' lands.

4. Neither were the manufacturers described hereinabove authorized by any owner of the debt or debts to craft, create, manufacture, and Record, any such purported Assignments,

26

which assigned nothing, yet created a façade of opacity for purposes of anticipated litigation against the Plaintiffs property owners, with the ultimate goal of wresting away the titles to their properties, all to inure to the wrongful and unjust enrichment of the perpetrators thereof.

5.    By participating in the schemes outlined hereinabove, defendants and each of them are liable for Slander of Title to Plaintiffs, for which Plaintiffs demand money damages.

## THIRD COUNT    Plaintiffs' Count for abuse of process [as to all defendants]

1.    Plaintiffs re-allege each of the previous allegations of paragraphs 1 to 101, above, as if set forth fully herein.

2 – 13.    Paragraphs 1 through 9, inclusively, of the First Count of the Complaint, and paragraphs 3 through 5, inclusively, of the Second Count of the Complaint, are hereby incorporated as if fully set forth as paragraphs 2 through 13, respectively, of this the Second Count of the Complaint.

14.    At no time did Defendants actually represent the facial plaintiff or plaintiffs represented in the caption Headings of the litigation they processed against the Plaintiffs herein.

15.    In actuality, Defendants acted in all respects as brigands and highwaymen, attempting to rob, and robbing, the Plaintiffs of their properties. The Defendants acted as rogue attorneys untethered to any client in interest, seeking to collect on yet some other financial institutions' claims of obligation, to the extent that they even existed.

16.    Defendants have built up a veritable cottage industry of litigation in which they scheme to attack the rights and interests of hapless property owners in an effort to wrest away land titles, sell the properties to inure to their own benefit, eject the homeowners, and convert the

27

equity in the Properties to the benefit of their counter-parties and themselves, all without right or interest in the Properties.

17. The schemes referenced in part hereinabove include the filing and prosecuting of utterly meritless litigation, bolstered by *faux*-witnesses such as Sony Prudent, the travelling professional witness who has no personal knowledge and regurgitates whatever Defendants put before him, wherein defendants act as marionette puppeteers, all for show before our Courts.

18. By pointing to "documents" which the Defendants themselves either manufactured or had artfully constructed by document-mills for them, instead of to any actual debt and the associated money trail, Defendants schemed to deceive and abuse the Courts, and did deceive and abuse the Courts, for the wrongful purpose of extracting Rulings, Opinions, and *faux*-Judgments as against Plaintiffs and others similarly situated.

19. The acts and practices of defendants and each of them, directly and by agent, are and constitute abuse of process, for which abuse and abuses the Plaintiffs demand money damages.

**FOURTH COUNT Plaintiffs' Count for vexatious litigation [as to all defendants]**

1. Plaintiffs re-allege each of the previous allegations of paragraphs 1 to 101, above, as if set forth fully herein.

2 - 7. Paragraph 9 of the First Count, and paragraphs 14 through 18, inclusively, of the Third Count of the Complaint are hereby incorporated as if set fully forth as paragraphs 2 through 7, respectively, of this the Fourth Count of the Complaint.

28

8. At no time did the Defendants in their role as attorneys or Officers of attorney law corporations, nor their employees, partners or Agent, however variously described, Jordan Schur and Zachary Grendi, actually represent Deutsche Bank in any capacity.

9. The act, acts, practice, and practices of the Defendants in promoting civil litigation against Plaintiffs in situations where defendants do not even represent the named plaintiff, have no contact with the named plaintiff, and do not receive instructions from the named plaintiff, and not for the benefit of the named plaintiff, are and constitute vexatious litigation.

10. Plaintiffs have been forced to expend vast amounts of time, mental energy, emotional energy, marital energy, and funds on countering the vexatious litigation promoted by Defendants, for which Plaintiffs demand money damages.

**FIFTH COUNT    Plaintiffs' Count for defamation [as to all defendants]**

1. Plaintiffs re-allege each of the previous allegations of paragraphs 1 to 101, above, as if set forth fully herein.

2. By pursuing as a matter of public record various suits against Plaintiffs, and by Filing various claims upon the Land Records slandering the titles of Plaintiffs' Properties, defendants have damaged the reputation and standing of Plaintiffs in their communities.

3. Both Plaintiffs have been forced into filing for protection from creditors before the United States Bankruptcy Court of the District of Connecticut. The Filings have disastrously impacted their credit reputation, made it effectively impossible to finance their fixed assets, made it impossible to obtain consumer credit, wrecked their marriages, and wreaked havoc upon their lives.

4.     The destruction of Plaintiffs' reputations was made by the Defendants and each of them with a callous impunity that is breathtaking in its reckless indifference, for which destruction the Plaintiffs demand damages.

## IV. RELIEF REQUESTED

102.     Plaintiffs demand money damages for civil theft, the damages being measured by the assessed value of their Properties, set at 70% of market value, as the benchmark for calculating the market value of their properties so wrongfully stolen from them.

103.     Plaintiffs further demand treble damages for the civil thefts complained of, as provided for under Connecticut General Statutes § 52-564, common law punitive damages for civil theft in the amount of their attorney's fees, interest from the date of the civil theft, the costs of this action, and such other and further relief to which they may be entitled at law or in equity.

104.     Plaintiffs seek money damages from Defendants and each of them for abuse of process in the amount of $2,000,000 each, to be levied jointly and severally as against all defendants, for their abuse of process.

105.     Plaintiffs seek money damages from Defendants and each of them for vexatious litigation in the amount of $6,000,000 each, to be levied jointly and severally as against all defendants, for their vexatious litigation.

106.     Plaintiffs seek money damages from Defendants and each of them for Defamation in the amount of $2,000,000 each, to be levied jointly and severally as against all defendants, for their Defamations.

And for Declaratory Relief:

107.     WHEREFORE, Plaintiff Young asks for Declaratory Relief by an Order issued to the Clerk of the Town of Stamford Ordering the striking of the various Assignments of Mortgage

and of Certificates filed against him in the Land Records thereof, such Filings to be declared null and void, and Plaintiff obtain further relief as follows:

    a. That Plaintiff be put back in title to the subject property as sole owner as is his right.

    b. That the suit in foreclosure of Plaintiff's void Mortgage be deemed null and void.

108.    WHEREFORE, Plaintiff Anna DeFranco hereby requests Declaratory Relief per the September 14, 2015 rescissions as follows:

    a. That Plaintiff be put back in title to the subject property as sole owner as is her right.

    b. That the suit in foreclosure of Plaintiff's void Mortgage be deemed null and void.

    c. That all documents recorded on or against title to the subject property in the Town of Berlin, State of Connecticut public land records alienating Plaintiff Anna Defranco's land title claims be declared null and void.

DATED this 26th day of April, 2021.

    Respectfully Submitted                By:  KAI-UWE M. YOUNG

KAI-UWE M. YOUNG
81 Pine Hill Avenue
Stamford, Connecticut 06906
(203) – 667-1187

By: ANNA DEFRANCO

ANNA DEFRANCO
225 Ox Yoke Drive
Berlin, Connecticut 06037
860-938-1556

31



